IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2015

**IN RE BONNIE L., ET AL.**

**Appeal from the Juvenile Court for Dickson County**
**No. 02-14-009-CC     A. Andrew Jackson, Judge**

_____

**No. M2014-01576-COA-R3-PT – Filed June 12, 2015**

_____

This appeal arises from the termination of Mother's and Father's parental rights. The children were removed from their parents' home because of drug exposure and domestic violence. A court adjudicated the children dependent and neglected about six months after their removal. Nearly two years later, the Department of Children's Services petitioned to terminate Mother's and Father's parental rights. Following a trial, the juvenile court found that two statutory grounds existed to terminate Mother's rights—substantial noncompliance and persistent conditions. The court found that three grounds existed to terminate Father's rights—abandonment for failure to visit, substantial noncompliance, and persistent conditions. The court also concluded that the termination of Mother's and Father's parental rights was in the children's best interest. Mother appeals the court's determination that there were statutory grounds to terminate her rights and that termination was in the children's best interest. Father also appeals the court's best interest determination, but he appeals the court's decision on only two of the three statutory grounds to terminate his rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Jennifer L. Honeycutt, Nashville, Tennessee, for the appellant, Amanda L.

Steven S. Hooper, Waverly, Tennessee, for the appellant, Mark S.

Herbert H. Slatery III, Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Amanda L. ("Mother") has five children. Three children were born out of wedlock to Mother and Joshua P.: Bonnie L., Emily P., and Jacob P.[1] Two children were born out of wedlock to Mother and Mark S. ("Father"): Markus S. and Makayla L. This appeal concerns Mother's parental rights to her five children and Father's parental rights to Markus and Makayla.

In November 2011, the Department of Children's Services ("DCS") removed the children from Mother's and Father's home because both parents were abusing alcohol and drugs and had engaged in domestic violence. All five children were placed into State custody. The Juvenile Court of Dickson County adjudicated the children dependent and neglected on June 20, 2012.

Several permanency plans were created for Mother, Father, and the children. Mother was present for the creation of the first permanency plan in November 2011. She signed the plan and agreed that she understood the criteria and procedures for the termination of parental rights. Father was not present for the creation of the plan, but it was later explained to him. A second permanency plan was developed on January 15, 2012. In June 2012, another permanency plan was created. Mother did not sign that plan and testified that she "had no memory" of the plan. Father stated that he refused to sign the June 2012 plan because he did not want to "give [his] kids away." On October 10, 2012, a fourth permanency plan was created. Despite being present, Mother refused to sign the plan.

In November 2013, Father's visitation with Markus and Makayla was "suspended until he [could] show a pattern of clear drug screens."[2] In January 2014, another permanency plan was created, which Mother signed. At some point, the children's therapists recommended that Mother no longer have visitation with the children. Apparently, Mother's visitation with the children had ended by February 2014.[3] In March 2014, a final permanency plan was developed.

Together, the permanency plans outlined many responsibilities for Mother and Father regarding visitation with the children, substance abuse, parenting, and anger

---

[1] Joshua P. surrendered his parental rights to Bonnie, Emily, and Jacob in July 2014, and his rights are not at issue in this appeal.

[2] After the first day of trial in the parental termination case, the court granted Father four hours per month of "therapeutically supervised visitation" with Markus.

[3] The record does not contain an order ending Mother's visitation with the children.

management, among other topics. Regarding visitation, the permanency plans made the parents responsible for visiting their children "on a consistent basis." In addition, the plans required the parents to: (1) notify the department within 24 hours if the visit needed to be rescheduled; (2) demonstrate appropriate parenting during visitation; (3) submit to random drug screens prior to visitation; and (4) provide transportation for themselves to and from visitation.

The permanency plans also included specific responsibilities for each parent. Father was required to: (1) demonstrate the skills learned from anger management and domestic violence classes; (2) complete a home study with DCS; (3) provide a copy of his lease to DCS; (4) have a "safe, stable living environment suitable for young children"; (5) ensure that anyone living with him agreed to a background check, drug screen, and to cooperate with DCS; (6) notify DCS within 24 hours of any contact information change; (7) sign all releases of information to DCS; (8) remain in contact with DCS; (9) participate in all meetings and court dates; (10) have "stable employment and provide proof through paystubs"; (11) resolve his legal issues and inform DCS of any legal events; (12) complete an alcohol and drug assessment, follow recommendations, pass random drug screens, and remain drug free; (13) take only medications prescribed to him and provide a prescription for each drug screen; and (14) follow the recommendations of his psychological evaluation.

Similarly, Mother was required to: (1) sign releases of information; (2) ensure that anyone living with her agreed to a background check, drug screen, and to cooperate with DCS; (3) notify DCS within 24 hours of any contact information change; (4) provide a copy of her lease agreement to DCS; (5) "refrain from drinking"; (6) "resolve all legal issues" and inform DCS of any legal events; (7) consent to a home study; (8) be "able to provide a safe, stable living environment for her children"; (9) have stable employment and provide proof through paystubs; (10) apply for the SafetyNet program; (11) have reliable transportation; (12) get her driver's license reinstated; (13) complete an in-patient alcohol and drug program; (14) address her alcohol and drug issues by participating in classes, remaining drug free, and passing drug screens; (15) follow all recommendations of her psychological evaluation; (16) complete domestic violence classes and not expose her children to abuse; (17) answer and return phone calls from DCS; (18) attend court and meetings as scheduled; (19) join Alcoholics Anonymous ("AA") and have a sponsor; (20) complete parenting classes; and (21) be able to provide for the children's basic needs.

On February 7, 2014, DCS petitioned to terminate Mother's parental rights to her five children, and Father's parental rights to Markus and Makayla.

A. PROOF AT TRIAL

The juvenile court conducted a trial on the petition to terminate Mother's and Father's parental rights on May 5 and July 11, 2014. In addition to Mother's and Father's testimony, DCS presented the following witnesses: Father's therapist; Mother's counselor; the director of a counseling program Mother and Father attended ("counseling director"); two therapists for Bonnie, Emily, and Jacob; two visitation supervisors; a Child Protective Services investigator; DCS workers; and a drug test administrator.

At trial, Mother admitted that she continues to drink "a little." Mother stated, "I've been a lot better than I really ever have lately," but she still drank "two or three beers" about "once a week." Mother agreed that, in March 2014, she told a DCS counselor that she was "[drinking] to get drunk" three to four times a week. She also admitted to being arrested for public intoxication and disorderly conduct between the first day of trial and the day the trial resumed. She was also arrested for domestic assault in October 2013, as a result of an altercation she had with Father while she was drinking. Although Mother had visited the children several times since they were removed, she stated that she and the children no longer have a relationship. Mother testified that she lived with her mother and was trying to regain her driver's license.

A number of counselors and DCS workers testified regarding Mother's alcoholism and drug use. A Child Protective Services investigator stated that Mother tested positive for methamphetamines, amphetamines, cocaine, THC, and opiates in October 2011. A counseling director testified that Mother completed several counseling programs arranged by DCS: a parenting class and assessment, a twenty-week domestic violence class, and individual counseling. Mother also participated in a twenty-four week drug and alcohol program, but the director stated that Mother "was not compliant throughout that program." Mother did not call-in every day to report her alcohol and drug status. She did not fulfill the journaling requirements, and she did not regularly attend AA meetings. The director testified that Mother had relapsed into her alcohol addiction several times during the alcohol program. Similarly, Mother's counselor testified that Mother "sporadically" attended AA meetings.

Two visitation supervisors testified about Mother's visitation with the children. The first visitation supervisor testified that Mother's visits with the children were "chaotic." The supervisor stated that the children could be chaotic even when they were not with Mother, but that they behaved better when they had "structure." The second visitation supervisor testified that the children's visits with Mother were sometimes "disorganized," and that Mother could seem "preoccupied." Although she agreed that the children were not in danger during the visits, the supervisor did not observe any bond between Mother and the children. However, the therapists for Bonnie, Emily, and Jacob testified that the children had a bond with Mother. Despite that bond, they recommended the children no longer have visitation with Mother because "every time they saw

[Mother] there was a spike in their behavior, that they would come home and have a fit. They'd have a tantrum."

Father admitted that he had taken marijuana and prescription Lortab when the children were removed from his home in November 2011. He largely maintained that he had not been able to visit the children because of scheduling difficulties with DCS. Despite his lack of visitation, Father maintained that he had a good relationship with the children. When asked to describe his relationship with the children, Father responded, "I've got [sic] a good relationship with them. We haven't seen them and they miss us."

Several witnesses testified regarding Father's drug use. A Child Protective Services investigator testified that Father admitted to her that he was using THC, Lortab, and alcohol when he was arrested in October 2011. A DCS team leader testified that Father completed a drug rehabilitation program in spring 2012. However, she stated that Father passed three drug tests, missed eight tests, and failed two tests between February 2012 and April 2013. In April 2012, he tested positive for oxycodone. On September 14, 2012, Father was "found to be tampering with the drug screen." Less than one week later, Father tested positive for marijuana and oxycodone. A social services case manager testified that she attempted to arrange drug tests for Father from September 2013 to April 2014. During that period, Father missed at least five drug tests, passed one test in September 2013, and failed one test in October 2013 when he tested positive for THC. Finally, an independent drug test administrator testified that she attempted to conduct a hair follicle drug screen on Father following the first day of trial, on June 27, 2014. Father left the drug testing facility before an adequate sample had been collected, even though the administrator informed him that the sample was incomplete. Father testified that he stopped using marijuana in January 2014.

Testimony also centered on Father's progress in addressing his anger issues. Father's therapist testified that, after monthly therapy was arranged for him, Father went to only three sessions, the last of which was in December 2013. The therapist opined that Father had made some progress in therapy, but Father was not able to fully address his "outside stressors" in therapy. The counseling director stated that Father did not complete any programs at the counseling center—he was "very resistant to being there." The social services case manager verified that Father completed an anger management course. A DCS team leader testified that Father completed a parenting assessment, clinical assessment, and psychological evaluation. However, she stated that Father had failed to "demonstrate appropriate parenting skills and [ ] the ability to manage anger appropriately."

## B. ORDER TERMINATING PARENTAL RIGHTS

In an order entered July 16, 2014, the juvenile court terminated Mother's and Father's parental rights. The court found two statutory grounds for terminating Mother's

rights, substantial noncompliance with the permanency plan and persistence of conditions. The court found three statutory grounds for terminating Father's rights: abandonment for failure to visit, substantial noncompliance with the permanency plan, and persistence of conditions. The court concluded that Father had abandoned his two children under Tennessee Code Annotated §§ 36-1-113(g)(1) and -102(1)(A)(i) (2014) because he had only visited his children once during the relevant four-month period preceding the filing of the petition to terminate.

As to the substantial noncompliance ground, the court concluded:

While [Father] did complete some of the tasks on the permanency plan, he only visited with the children one time in the four months preceding the filing of the petition. The Court had ordered that he show a pattern of clean drug screens before he could visit, and [Father] was unwilling to take or unable to pass the screens. [Father] did not participate in individual counseling as recommended by his psychological evaluation.

While [Mother] did complete some of the tasks on the permanency plan, she still has [a] significant substance abuse issue. She admitted to [the] Foster Care Review Board and her case worker in March 2014, that she continues to drink 3-4 times a week and did that to get drunk. She was arrested in May 2014, for public intoxication and disorderly conduct. She has not been able to demonstrate the skills she has learned in parenting despite two years and eight months of therapeutic visitation.

Regarding the persistent conditions ground, the court stated:

It is clear the children have been removed for more than six months. The children were taken into DCS's custody on November 2, 2011, and, since that date, [Mother] and [Father] never regained custody of the children.

Secondly, the Court concludes that the conditions which led to the children's removal still persist. In the underlying dependency and neglect proceeding here, the Court found that removal was proper due to [Father's] and [Mother's] drug and domestic violence issues. The conditions still persist because neither parent has resolved their substance abuse issues.

The Court also concludes that there are other conditions which in all reasonable probability would cause the children to be subjected to further abuse or neglect and which, therefore, prevent the children's safe return to the care of the parent.

Moreover, there is little likelihood that these conditions will be remedied at an early date. The children have been in custody for two years and eight months. The parents have not resolved their substance abuse issues. [Mother] is unable to demonstrate that she has the ability to appropriately parent her children, and [Father] has failed to address his mental health issues.

Finally, the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home, and the Court concludes that [Mother] and [Father] failed to remedy the persistent conditions that prevent the children's return.

The court also found that the termination of Mother's and Father's rights was in the children's best interest. In its order, the court stated:

[Mother] and [Father] have not made any adjustment of circumstance, conduct, or conditions. Tenn. Code Ann. § 36-1-113(i)(1). The Court finds that [Mother] and [Father] have been given many opportunities and the Department has made reasonable efforts to assist [them] in working on tasks in the permanency plan and to maintain visitation.

The Court concludes that [Mother] and [Father] have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. Tenn. Code Ann. § 36-1-113(i)(2).

The Court concludes that [Father] has not maintained regular visitation or other contact with the children. Tenn. Code Ann. § 36-1-113(i)(3).

The Court concludes that termination is in the children's best interest under Tenn. Code Ann. § 36-1-113(i)(4) in that there is no meaningful relation[ship] established between the children and [Father].

The Court concludes under Tenn. Code Ann. § 36-1-113(i)(7) that [Mother's] and [Father's] use of alcohol or controlled substances render them consistently unable to care for the children in a safe and stable manner.

The Court concludes that [Mother] and [Father] continue to make lifestyle choices that prevent them from being able to parent the children or provide a home for the children.

Mother and Father timely appealed the juvenile court's judgment.

## II. ANALYSIS

Termination of parental rights is one of the most serious decisions courts make. *Santosky v. Kramer*, 455 U.S. 745, 787 (1982) ("Few consequences of judicial action are so grave as the severance of natural family ties."). Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1) (2014).

A parent has a fundamental right, based in both the federal and State constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). Although this right is fundamental, it is not absolute. The State may interfere with parental rights through judicial action in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *see Santosky*, 455 U.S. at 769, and its purpose "is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see also In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The party seeking termination has the burden of proof. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

On appeal, we review the trial court's findings of fact in termination proceedings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Next, "[i]n light of the heightened burden of proof in [termination] proceedings . . . [we] must then make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo without any presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993)).

## A. STATUTORY GROUNDS FOR TERMINATION

The juvenile court found two statutory grounds for terminating Mother's parental rights: (1) substantial noncompliance with the permanency plan and (2) persistence of conditions. Mother appeals the court's decision on both grounds. The juvenile court found three statutory grounds for terminating Father's parental rights: (1) abandonment for failure to visit; (2) substantial noncompliance with the permanency plan; and (3) persistence of conditions. Father appeals only the court's decision on the substantial noncompliance and persistence of conditions grounds.

Father leaves the court's finding of abandonment for failure to visit unchallenged. Generally, courts address only the issues raised by the parties. Tenn. R. App. P. 13(b); *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012). Party control over issue presentation is considered a defining characteristic of the American adversarial system. *See United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring). However, courts may sometimes engage in a sua sponte review of issues not raised by the parties on appeal. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Blumberg Assocs. Worldwide, Inc. v. Brown & Brown of Conn.*, 84 A.3d 840, 855-69 (Conn. 2014); *Bell v. Todd*, 206 S.W.3d 86, 90-91 (Tenn. Ct. App. 2005); *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000). For example, our courts have considered justiciability issues even when parties have not presented such issues for review. *See, e.g.*, *Scales v. Winston*, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988) (jurisdiction); *Osborn*, 127 S.W.3d at 740 (standing); *Hooker v. Haslam*, 437 S.W.3d 409, 433 (Tenn. 2014) (mootness). In addition to justiciability questions, Tennessee Rule of Appellate Procedure 13(b) recognizes that appellate courts may review issues not raised by the parties in certain circumstances:

> Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among

other reasons: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process.

Tenn. R. App. P. 13(b).  Despite possessing the discretion to review an issue not raised by the parties on appeal, "this discretion [should] be sparingly exercised."  Tenn. R. App. P. 13(b) cmt.

Yet, in the context of parental termination cases, on occasion we have reviewed all the grounds relied upon by the trial court to terminate parental rights, even if the parent did not appeal every ground.  *See, e.g.*, *In re Anya G.*, No. E2013-02595-COA-R3-PT, 2014 WL 4233244, at *8 (Tenn. Ct. App. Aug. 27, 2014) (reviewing the ground of abandonment, although the mother did not appeal that ground); *In re Justin K.*, No. M2012-01779-COA-R3-PT, 2013 WL 1282009, at *8 n.6 (Tenn. Ct. App. Mar. 27, 2013) (examining whether termination was in the children's best interests due to the "gravity of the determination," even though the parent did not brief the issue); *In re L.M.W.*, 275 S.W.3d 843, 847 (Tenn. Ct. App. 2008) (discussing two grounds for termination despite Father's concession in his brief that the grounds were established); *cf. In re L.L.F.*, No. M2007-01656-COA-R3-PT, 2008 WL 555700, at *7 (Tenn. Ct. App. Feb. 29, 2008) (reviewing the statutory ground the mother appealed, but acknowledging that the mother did not appeal all grounds for termination).  We are also mindful of our Supreme Court's instruction that we should review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases."  *In re Angela E.*, 303 S.W.3d at 251 n.14.

However, our supreme court's direction in *In re Angela E.*, 303 S.W.3d 240 (Tenn. 2010), does not mandate review of every ground for termination of parental rights relied upon by the trial court irrespective of whether an appeal is taken from every ground.  *See, e.g.*, *In re Kyla P.*, No. M2013-02205-COA-R3-PT, 2014 WL 4217412, at *3 (Tenn. Ct. App. Aug. 26, 2014) (addressing only whether termination was in the child's best interests where the father did not appeal any statutory grounds); *In re A.T.S.*, No. M2004-01904-COA-R3-PT, 2005 WL 229905, at *3 (Tenn. Ct. App. Jan. 28, 2005) (examining only whether termination was in the child's best interests where the mother did not appeal the statutory ground).  The danger of "unnecessary remand" from the Supreme Court is largely eliminated [4] where the issue cannot be raised by the parties in any future appeal.  *See State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000) (declining to examine a claim because it was not raised on direct appeal).

In this situation, we exercise our discretion under Tennessee Rule of Appellate Procedure 13(b) to review all statutory grounds for the termination of Father's parental rights.  In doing so, we acknowledge that our Supreme Court is currently examining

---

[4] The danger of unnecessary remand cannot be completely eliminated because the Supreme Court possesses the same discretion to consider issues not raised on appeal.  Tenn. R. App. P. 1, 13(b).

whether an appellate court should review all grounds for termination of parental rights irrespective of the issues raised on appeal. *In re Carrington H.*, No. M2014-00453-COA-R3-PT, 2014 WL 5390572 (Tenn. Ct. App. Oct. 21, 2014), *perm. app. granted* (Tenn. Jan. 28, 2015).

### 1. Abandonment for Failure to Visit

"Abandonment is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d at 640; *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2014). In this case, the petition was filed on February 7, 2014. Therefore, the relevant four-month period begins on October 7, 2013, and ends on February 6, 2014. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the last day of the four month period is the day before the petition is filed).

Petitioners carry the burden to demonstrate by clear and convincing evidence that parents abandoned their children by willfully failing to visit them. *See In re Audrey S.*, 182 S.W.3d at 864. Whether a parent failed to visit is a question of fact, which we presume to be correct unless the evidence preponderates otherwise. *In re Adoption of Angela E.*, 402 S.W.3d at 640. However, whether a parent's failure to visit was willful is a question of law, which we review de novo with no presumption of correctness. *Id.*

In the context of termination of parental rights actions, "'willfulness' does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d at 863. Willfulness is also not determined by the party's ill will or malevolence. *Id.* Instead, conduct is willful if it is intentional or voluntary, rather than coerced, accidental, or inadvertent. *Id.* In other words, a person acts willfully "if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* Willfulness is also determined by the party's intent, which triers of fact may infer from circumstantial evidence like the party's actions or conduct. *Id.* at 864.

Failure to visit a child is willful when a parent is aware of his duty to visit, "has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* A failure to visit cannot be excused by another person's conduct "[u]nless the conduct actually prevents the person with the obligation from performing [his duty] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* (citations omitted).

Father did not appeal the conclusion that he abandoned his children by failing to visit, perhaps sensing the overwhelming proof on that ground. During the relevant four-month period, Father visited Markus and Makayla only once, on October 18, 2013. One visit during a four-month period constitutes only token visitation, at best. *See* Tenn.

- 11 -

Code Ann. § 36-1-102(1)(C); *see also In re Keri C.*, 384 S.W.3d 731, 751 (Tenn. Ct. App. 2010) (holding that a Mother who visited her child four times during the relevant period engaged in only token visitation).

We also conclude that the failure to visit was willful. Father had the opportunity to visit the children by merely submitting to and passing drug screens. However, Father failed drug tests, refused to take tests, or made himself unavailable for such testing. Father was aware of his duty to visit because he signed several permanency plans acknowledging his responsibility to visit the children. Father also had the capacity to visit his children. Father had no justifiable excuse for failing to visit his children. *See In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010) ("A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child."). In sum, the facts provide clear and convincing evidence that Father abandoned his children by willfully failing to visit them.

## 2. Substantial Noncompliance

Tennessee Code Annotated § 36-1-113(g)(2) authorizes the termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). Mother and Father argue that, although they did not perfectly comply with the permanency plan, they completed most of its requirements. Therefore, they maintain the trial court erred by finding this statutory ground for termination.

Before analyzing whether the parent complied with the permanency plan, the trial court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. Mere noncompliance is not enough to terminate a parent's rights. *Id.* at 548. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of

permanency in children's lives. We think that where 'return to parent' is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

The trial court expressly found that Mother's and Father's responsibilities under the permanency plans "were reasonably related to remedying the conditions that necessitate foster care." Neither parent questions this finding, and we agree with the trial court's determination on this issue. Therefore, substantial noncompliance with the permanency plans could serve as a basis for terminating parental rights.

We acknowledge that Mother satisfied some of the permanency plans' requirements. Most notably, the counseling director testified that Mother completed several counseling courses related to parenting and domestic violence. Mother maintained contact with DCS and attended several DCS meetings and most court meetings. She completed several other requirements, including an alcohol and drug assessment and psychological evaluation, and she submitted to, and passed, regular drug screens.[5] She also consistently visited her children "for a while," until the visitations were ended.

Despite Mother's cooperation with some aspects of the permanency plans, she did not complete several critical requirements. Mother has not resolved her legal issues—she was arrested for assault in October 2013 and for public intoxication and disorderly conduct after the first day of trial. Mother did not provide proof of stable employment to DCS, nor had she secured a driver's license or reliable transportation in order to pursue full-time employment. Even after over two years of counseling and coursework, the visitation supervisors testified that Mother had not demonstrated the parenting skills necessary to provide a stable, safe home for her five children. The supervisors stated that the children's visitation with Mother was often "chaotic" or "disorganized," and that Mother was unable to control and supervise the children.

Most importantly, Mother did not refrain from drinking alcohol, and she has not resolved her alcohol abuse issues. The importance of a particular requirement must be considered in determining whether a parent's noncompliance with the permanency plans was "substantial." *In re M.J.B.*, 140 S.W.3d at 656. It is evident from the record that the primary reason Mother was unable to consistently care for her children was her alcohol dependency. As late as two months before trial, Mother was drinking to get drunk three to four times a week. Unfortunately, Mother testified at trial that she continues to drink

---

[5] According to the social services case manager, the drug screens did not test for alcohol.

two or three beers "once a week, maybe." Although she sometimes attended AA and identified a sponsor, her counselor stated that Mother did not meet regularly with her sponsor.

Although Mother attempted to address her alcoholism through drug and alcohol programs, she did not fulfill the programs' requirements. We hope Mother's efforts to deal with her alcoholism will ultimately be successful, but the record demonstrates that, as of yet, she is not in recovery from her addiction. Thus, she has failed to fulfill the most important requirement of the permanency plans.

Father also fulfilled some of the permanency plans' requirements. The social services case manager verified that Father had completed an anger management course. A DCS team leader testified that Father completed a drug rehabilitation program, a parenting assessment, clinical assessment, and psychological evaluation. Father also began to follow the recommendations of his psychological evaluation by participating in therapy.

However, Father's compliance with the permanency plans largely consisted of completing several tasks without making meaningful changes that would permit the safe return of his children. Although he attended a drug rehabilitation program, he admitted to using drugs until at least January 2014. The trial court also found that he continued to use illegal drugs. Father has also failed to address his mental health issues. He discontinued the therapy sessions DCS arranged for him after only three sessions. As a result, he was unable to complete one of the most important permanency plan requirements—addressing his anger issues and post-traumatic stress disorder ("PTSD"). Despite completing a parenting and anger management course, the DCS team leader testified that Father failed to "demonstrate appropriate parenting skills and [ ] the ability to manage anger appropriately." Additionally, Father did not remain in contact with DCS, submit to drug screens, or visit his children consistently.

We find that Mother and Father failed to substantially comply with the requirements of the permanency plans. Consequently, the trial court properly concluded that substantial noncompliance with the permanency plans was an appropriate ground for terminating Mother's and Father's parental rights.

### 3. Persistence of Conditions

Under Tennessee Code Annotated § 36-1-113(g)(3), parental rights may be terminated where:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

- 14 -

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or a guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3). This ground for termination of parental rights is commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The goal of the persistence of conditions ground is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate her ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

The trial court found that the children had been removed from Mother's and Father's home for at least six months, and neither parent contests that finding. Each of the additional statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. We address each element in turn.

First, we conclude that the conditions that led to the children's removal still persist and will, in all reasonable probability, prevent the children's safe return to Mother's and Father's care. The children were removed from the home because of domestic violence, substance abuse, and the parents' imminent incarceration. Both parents claim that, because they are not incarcerated and have successfully completed alcohol and drug therapy, the conditions that led to the children's removal no longer exist. While Mother was not incarcerated at the time of trial, between the first and second trial dates, authorities arrested her for public intoxication and disorderly conduct. She also admitted that she was still abusing alcohol. Mother conceded she did not fully complete the alcohol treatment programs and continues to drink weekly. Father also was not incarcerated at the time of trial, but he has not yet addressed his anger issues. The trial

- 15 -

court also found that Father was continuing to use illegal drugs. These serious conditions prevent the children's safe return to the parents' custody.

There is also little likelihood that Mother and Father can remedy their substance abuse and anger issues in the near future so that the children can be safely returned to them. For nearly two and one-half years, DCS has provided the resources for Mother to attend in-patient and out-patient rehabilitation, AA, individual and group counseling, and other treatment facilities to address her alcoholism. In that time, Mother "really tried" to address her problems, but she admits to continued struggles with alcohol dependency. The counseling director testified that Mother did not successfully address her alcohol addiction, despite numerous classes and attempts since the children were removed in 2011. Mother's counselor stated that Mother attended AA only "sporadically." Mother continues to drink regularly and has not yet demonstrated the parenting skills necessary to care for her five children at home.

In the same time period, DCS provided therapy, counseling, drug rehabilitation, and educational courses for Father to address his drug use and anger issues. He failed to complete therapy, several counseling programs, and some educational courses. For over two and one-half years, Father has not made significant progress in addressing his PTSD or anger issues. He abandoned the therapy program arranged for him and has not yet addressed his "outside stressors."

Finally, the continuation of a parent-child relationship between Mother and Father and their children will only threaten their ability to permanently integrate into a stable home. We do not doubt the sincerity of Mother's desire to provide her children with a safe, stable home, but she is unable to do so. The children have had a hard time adjusting in foster homes, due in part to their prior turbulent home life. Both therapists for Bonnie, Emily, and Jacob testified that the children behaved poorly after visitations with Mother but that their behavior has improved since visitation with Mother ended. Terminating Mother's rights will allow all five children to begin the process of assimilating into a permanent and stable home.

Although Father claims to have a good relationship with his children, he visited them only once in the relevant four-month period. He has also failed to address his anger and drug issues in a manner that would allow him to care for his children in the long-term. Markus and Makayla have now been in custody for over three years. They deserve the opportunity to integrate into a safe and stable home.

Because each of the elements of Tennessee Code Annotated § 36-1-113(g)(3) were established by clear and convincing evidence, the trial court did not err in concluding that termination of parental rights was justified on the ground of persistence of conditions.

B. BEST INTEREST OF THE CHILDREN

The focus of the best interest analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Tennessee Code Annotated § 36-1-113(i) (2010) lists nine factors that courts may consider in making a best interest analysis. Not every factor enumerated in the statute applies to every case because the facts of each case can vary widely. *In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4 (Tenn. Ct. App. Feb. 18, 2014). The juvenile court determined that it was in the children's best interest for Mother's and Father's parental rights to be terminated based on the following five factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

. . . .

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.

Tenn. Code Ann. §§ 36-1-113(i)(1)-(4), (7).

The juvenile court found Mother and Father had not made such an adjustment of their circumstance, conduct, or conditions so as to make it safe and in the children's best interest to be in their home. *See id.* § 36-6-113(i)(1). Mother claims she has changed and addressed her drug and alcohol issues by attending several counseling programs. However, as discussed above, Mother continues to struggle with alcoholism, parenting

- 17 -

skills, and legal issues. Father also continues to struggle with substance abuse and anger management issues.

The court also found that Mother and Father failed to effect a lasting adjustment after reasonable efforts by DCS for two and one-half years. DCS provided both parents with a litany of resources. Mother took advantage of some of those services, including classes on parenting and domestic violence. Father completed only a few counseling and educational opportunities offered by DCS. However, neither parent has made a *lasting adjustment* in their substance abuse habits or domestic relationships. Despite the efforts of DCS and numerous social services agencies, domestic violence and substance abuse continue to dominate both parents' lives.

Father also did not maintain visitation or contact with the children. He visited Markus and Makayla only one time during the four months preceding the filing of the petition to terminate his parental rights. Father maintains that he tried to visit his children, but he was often unable to coordinate a drug test with DCS staff before the visit. On the other hand, Mother did regularly visit the children before visitation was ended, but those visits were often "chaotic." Mother did not demonstrate appropriate parenting and supervision skills.

Both Mother and Father claim they have a meaningful relationship with their children. When asked to describe his relationship with the children, Father responded, "I've got [sic] a good relationship with them. We haven't seen them and they miss us." However, Father's statement is belied by his lack of meaningful contact with his children leading up to the termination proceeding.

When asked to describe her relationship with the children, Mother replied, "There isn't one now." A therapist for Jacob, Bonnie, and Emily testified that she believed those three children had a "bond" or "relationship" with Mother. On the other hand, a visitation supervisor testified that none of the children appeared to have a bond with Mother. The supervisor stated that, beginning in March 2013, the children began to show less of a bond with Mother during visitation sessions. The record indicates that Mother and the children do have a relationship, but it is one that creates only negative outcomes for the children.

Finally, the continued presence of alcohol in Mother's home prevents her from being able to consistently care for her children in a safe and stable manner. Between the first and second trial dates, authorities arrested Mother for public intoxication and disorderly conduct. Her therapists and counselors testified that she has not satisfactorily completed alcohol and drug training, and has not yet addressed her addiction.

Likewise, Father's anger issues and continued drug use prevents him from being able to consistently care for Markus and Makayla in a safe and stable manner. Father

- 18 -

was diagnosed with PTSD and has not completed the therapy or counseling necessary to manage his stressors or expressions of anger. Father attended only three therapy sessions. The DCS team leader testified that Father was unable to demonstrate appropriate parenting or anger management skills. The trial court also found that Father continues to use illegal drugs, and the evidence does not preponderate against that finding. During the two years the children have been removed, Father has failed a few drug tests, missed numerous drug tests, and has hindered at least two drug tests. Moreover, Mother and Father have demonstrated that when they abuse drugs and alcohol, they become violent.

As noted above, the list of statutory factors to consider in a best interest analysis is not exhaustive, and we do not need to "find the existence of each enumerated factor before [we] may conclude that [termination] is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667. Here, we conclude there is clear and convincing evidence that the termination of Mother's parental rights is in the best interest of all five children. We also conclude there is clear and convincing evidence that the termination of Father's parental rights is in the best interest of Markus and Makayla.

### III. CONCLUSION

We conclude that there is clear and convincing evidence of the statutory grounds relied upon by the juvenile court to terminate Mother's and Father's parental rights. We also conclude that there is clear and convincing evidence that termination is in the best interest of the children. Therefore, we affirm the judgment of the juvenile court.

_____
W. NEAL McBRAYER, JUDGE